# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RACHAEL SIMS,

     Plaintiff,

v.

IMMEDIATE CREDIT RECOVERY INC.,

     Defendant.

Case No. 17-CV-67-JPS

**ORDER**

## 1.   INTRODUCTION

Plaintiff obtained a student loan through the Department of Education ("DOE"). When she defaulted on the loan, the DOE brought in Defendant Immediate Credit Recovery, Inc. ("ICR") to help collect what was owed. The DOE also began administratively garnishing Plaintiff's wages. Plaintiff contacted ICR in an attempt to stop the garnishment. Over several months, Plaintiff worked with ICR to become eligible for the DOE's loan rehabilitation program, which would end the garnishment. Plaintiff's lawsuit alleges that ICR obstructed her efforts to enter the program, unnecessarily prolonging her garnishment. She maintains that this conduct violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Wisconsin Consumer Act ("WCA"), Wis. Stat. § 427 *et seq.*

On September 5, 2017, ICR filed a motion for summary judgment. (Docket #40). Plaintiff opposed the motion on October 9, 2017, and ICR replied on October 23, 2017. (Response, Docket #49; Reply, Docket #51). Plaintiff then sought leave to submit a sur-reply, alleging that ICR raised new arguments in its reply brief. (Docket #53). The Court will grant that

motion and accept Plaintiff's sur-reply. It does not change the result—summary judgment is appropriate in ICR's favor on all of Plaintiff's claims.

2. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

3. **FACTUAL BACKGROUND**

Upon review of the parties' factual briefing, the Court finds that the following facts are material to ICR's motion. The Court notes the parties' disputes where appropriate.[1] ICR works for the DOE to help collect delinquent DOE-issued student loans. ICR receives a commission for this work, which in Plaintiff's case was 15.2% of the wages which had been garnished from her. The DOE refers to ICR, and the many other companies performing similar services, as "private collection agencies" or "PCAs."

---

[1] The facts are drawn from the parties' factual briefing, (Docket #48 and #50), unless otherwise indicated.

The activities of PCAs are governed by a DOE-issued document known as the PCA manual (the "Manual"), as well as various laws. PCAs are charged not only with collecting student loans, but assisting in rehabilitating defaulted loans. Rehabilitation is one way to end wage garnishment for a borrower in default.

PCAs use a multi-step process to determine eligibility for loan rehabilitation. First, they obtain information about the borrower's income, expenses, and family size over the phone. The PCA uses that information to arrive at an estimated rehabilitation payment. The borrower immediately begins making estimated payments, while also sending a "Financial Disclosure for Reasonable and Affordable Rehabilitation Payments" form ("Financial Disclosure" form) and income verification documents (such as pay stubs) to the PCA. Once all of the documents and forms are submitted, the information is processed by the PCA and the DOE. The borrower must also make nine of the estimated monthly payments to qualify for rehabilitation.

If they confirm the borrower is eligible for loan rehabilitation, the PCA sends a rehabilitation agreement letter ("RAL") containing the final terms. The final rehabilitation payment stated therein may be higher or lower than the estimated payment. If it is higher, the borrower has an opportunity to challenge that figure. If the borrower accepts the terms of the RAL, they must sign and return it to the PCA. Only then is the borrower formally entered into the rehabilitation program. Plaintiff says that according to the Manual, the RAL must be sent within fifteen days of receiving the borrower's completed paperwork.

On April 30, 2016, the DOE placed Plaintiff's defaulted student loan with ICR for collection. In October 2016, wage garnishment began.[2] At that time, Plaintiff attempted to contact ICR. She called and left messages with ICR on October 20, and the called on each day from November 1 to November 4, 2016. She was unable to speak with someone in the department handling her loan, however, and ICR could not reach her each time it tried calling back.

Finally, on November 28, 2016, Plaintiff spoke with an ICR representative, Ashley Hunter ("Hunter"). Hunter told Plaintiff about the loan rehabilitation program. She noted that an active wage garnishment may be suspended after the fifth consecutive estimated rehabilitation payment is made, so long as the borrower has met all of the other requirements for rehabilitation. Hunter further stated that Plaintiff was required to send in proof of her income, and that "[o]nce your proof of income is received and reviewed, a [RAL] will be sent to you within 15 days." (Docket #48 at 8). Finally, Hunter informed Plaintiff that she would not be entered into the rehabilitation program until the Financial Disclosure and RAL forms were signed and returned, and advised Plaintiff to complete those tasks as soon as possible.[3]

---

[2]The parties dispute who is actually responsible for the garnishment. ICR, via its corporate representative, says that the DOE alone garnished Plaintiff's wages. (Docket #39-1 at 8). Plaintiff counters that the DOE charged ICR with monitoring the garnishment process and that ICR itself "actually pushes the [electronic] button that starts the garnishment." (Docket #48 at 4). The Court need not resolve the issue as it is not material to the disposition of the case.

[3]Plaintiff notes that there was no true deadline for her to complete her paperwork, but ICR gives its collectors a bonus if they can obtain the paperwork from a borrower in a two- to three-month window.

Hunter then took Plaintiff's relevant financial information. Plaintiff's statements indicated that she had one dependent and a family size of two, meaning that her estimated rehabilitation payment was five dollars. Hunter told Plaintiff she could make her payment over the phone or by mail. Hunter said that a payment made that day would be credited to November 2016 (thus speeding along Plaintiff's path towards rehabilitation). Plaintiff made a payment over the phone at that time. On December 30, 2016, Plaintiff called to make her next payment. No one was available to take her call, so she left a message.

In a January 10, 2017 conversation with ICR, ICR's representative said that the November 2016 payment was posted on December 1, 2016. To Plaintiff, this suggested that the payment was credited to December 2016. Thus, in her view, it had not been not processed in accordance with Hunter's promise in the November 28 telephone conversation. ICR explains that the even though the payment was posted on December 1, it still counted as a November payment. In fact, ICR states that Plaintiff could have elected to apply the payment to November or December. Shifting the payment from one month to the other may have assisted Plaintiff in completing the above-described steps towards entry into the rehabilitation program.[4] Plaintiff was not told about these policies, however, during the January 10 conversation or at any other time.

Plaintiff faxed the Financial Disclosure form and her paystubs to ICR on April 25, 2017. In an affidavit submitted with her response brief, Plaintiff explains that she waited to send in the documents because she wanted to

---

[4]Plaintiff did not make another payment until January 30, 2017. Thus, her November payment was not consecutive and could not be counted towards the required five consecutive payments needed to suspend the garnishment.

complete the five payments required to suspend the garnishment. By her calculation, her fifth payment was made in April 2017. If she had been told about the ability to move the November 2016 payment to December 2016, she could have reached her fifth payment in March 2017. Plaintiff further states that ICR did not process her paperwork within fifteen days as they had promised to do. Instead, it took ICR seventy-one days to process her documents and issue the RAL.

ICR counters that the fifteen-day period only began once it reviewed her documents, not simply upon their receipt. Further, it claims that Plaintiff's instant explanation for waiting until April 2017 to return her paperwork contradicts her deposition testimony. During her deposition, she stated that she waited because of her difficulties in obtaining the paperwork in October and November 2016. She acted in April 2017 apparently upon advice from her lawyer. Finally, as to Plaintiff's focus on the continuing garnishment, ICR informed her in the November 28 conversation that she could request a hearing to dispute the garnishment at any time.

Plaintiff's account was placed in a suspended status when ICR received this lawsuit on January 26, 2017. ICR says that it does not communicate with borrowers who are in suspended status. Thus, when it received Plaintiff's paperwork in April 2017, ICR claims that it could not contact Plaintiff. Plaintiff counters that ICR spoke with her a number of times to take monthly payments. ICR also communicated about the garnishment through Plaintiff's counsel.

In fact, Plaintiff's counsel asked ICR about the status of Plaintiff's rehabilitation paperwork on June 13, 2017.[5] Plaintiff's counsel was told that Plaintiff had left blank the "family size" portion of the Financial Disclosure form. ICR implies that it did not contact Plaintiff earlier about this issue because of the suspended status of Plaintiff's account. In accordance with DOE standards, when confronted with the blank family size on Plaintiff's Financial Disclosure form, ICR defaulted to a family size of one. This meant that, from ICR's perspective, Plaintiff's five dollar monthly payments were too low and did not count towards her entry into the rehabilitation program.

This was, of course, different than the information Plaintiff provided in the November 2016 phone call, and ICR claimed that they were required to use what was in the form. On June 29, 2017, ICR, via counsel, asked Plaintiff, via counsel, to complete another Financial Disclosure form consistent with the telephone information. The updated form was provided on June 30, 2017. Plaintiff's updated form corrected the issue by confirming that Plaintiff's family size was two. This allowed Plaintiff to receive appropriate credit for her earlier payments. ICR performed this review on July 5, 2017. Normally, however, it was ICR's practice to process the Financial Disclosure form and related paperwork within 48 hours of receipt.

With the paperwork correctly completed, ICR was finally able to send Plaintiff her RAL on July 6, 2017. Plaintiff signed and returned the letter that same day. ICR notified the DOE that it should stop the

---

[5] Plaintiff herself had called ICR to inquire about the paperwork on June 1, 2017. The operator attempted to transfer her to the correct department, but Plaintiff declined to be transferred, as she had a limited amount of time to speak with ICR.

garnishment on August 1, 2017. The last garnishment occurred in Plaintiff's July 2017 paycheck. Plaintiff maintains that the Manual require the RAL to be processed within three days, meaning that ICR's stop order was extremely late. ICR objects to the version of the Manual provided by Plaintiff, which contains this three-day limit, because it lacks foundation and is heavily redacted for unknown reasons. *See* (Docket #50-3 at 69-98).[6]

As to the saga of the improperly-completed Financial Disclosure form, Plaintiff says it was largely unnecessary. She suggests that ICR should have used a family size of one—a default assumption contained in ICR's training materials—to complete its review of her paperwork.[7] ICR would have then been equipped to issue the RAL within fifteen days of receiving Plaintiff's April 25, 2017 fax. Again, Plaintiff believes this fifteen-day turnaround time was promised to her at the beginning of the rehabilitation process. Plaintiff also cites the relevant portion of the Manual, which states that "the PCA must send the RAL letter within 15 days of the receipt of all required documentation." *Id.* at 87. Plaintiff could have then objected to the payment amount listed in the RAL. Plaintiff asserts that all of this would have resulted in stopping the garnishment sooner.

ICR stresses that "all required documentation" must actually be received, which was not the case on April 25, 2017, namely with respect to the incomplete Financial Disclosure form. Plaintiff finds that this contention, supported by ICR's internal policies, is in conflict with the

---

[6]ICR nevertheless concedes that its contract with the DOE requires ICR to abide by the terms of the correct version of the Manual, if Plaintiff's copy is indeed different. *See infra* Note 10.

[7]The training materials were referenced in the deposition of ICR's representative as Exhibit 12. (Docket #50-3 at 109:4-111:2). That exhibit was not included in Plaintiff's summary judgment submissions.

Manual. ICR argues that "[l]ogically, . . . ICR must actually review the documents it receives for accuracy rather than just blindingly [sic] accepting them before sending the RAL." (Docket #50 at 10).

## 4. ANALYSIS

ICR seeks summary judgment on each of Plaintiff's claims and requests dismissal of the entire lawsuit. Plaintiff's Third Amended Complaint (her operative pleading) states two causes of action, one under the FDCPA and the other under the WCA. (Docket #35 at 5-7). The Court addresses each cause of action separately below.[8]

### 4.1 FDCPA

The FDCPA is, as its name suggests, intended to "eliminate abusive debt collection practices." 15 U.S.C. § 1692(e). It contains a number of subsections which regulate certain debt collection practices. Plaintiff says ICR's conduct violated three of those subsections. Section 1692d proscribes "any conduct the natural consequence of which is to harass, oppress, or abuse" a consumer. *Id.* § 1692d. Section 1692e prohibits the use of false or misleading representations in the collection of a debt. *Id.* § 1692e. Finally, Section 1692f disallows the use of "unfair or unconscionable means" in collecting debts. *Id.* § 1692f. Each of these subsections have, in turn, enumerated subparts providing specific examples of prohibited conduct. *Id.* §§ 1692d, e, f. The subparts do not, however, limit the general application of each section's preamble. *Id.*

---

[8]In response to ICR's summary judgment motion, Plaintiff withdrew two aspects of her FDCPA claim. First is her assertion that ICR failed to provide notice of the garnishment before initiating it. (Docket #35 at 2-3, 5). Second is a claim under Subpart (5) of Section 1692e, which bars "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken." Accordingly, the Court makes no further mention of these issues.

Plaintiff's overarching theory of this case informs the Court's analysis as to the majority of her FDCPA claims. In her response brief, Plaintiff continually grounds these claims in ICR's alleged violations of the terms of the Manual or ICR's internal policies. She points to three such violations. First, ICR did not process Plaintiff's paperwork and send her the RAL within the fifteen-day time period set forth in the Manual, but instead took seventy-one days to do so. (Docket #49 at 3-5). Second, pursuant to its own policies, ICR should have ignored her mistake on the Financial Disclosure form and should have issued the RAL immediately based on an assumed family size. *Id.* Third, after receiving the properly completed paperwork and five consecutive monthly payments, ICR took twenty-six days to stop the garnishment, when the Manual calls for this to be done in three. *Id.* at 5-6.

All but one of Plaintiff's FDCPA claims are premised on these violations. Namely, Plaintiff asserts that ICR's failure to abide by the Manual's terms or its own policies necessarily made its conduct "oppressive," "misleading," and "unfair," and delayed the end of her garnishment. This theory is tied only to the terms of the Manual and ICR's policies. Plaintiff does not argue that the entire course of ICR's conduct was too slow in a general sense.[9]

---

[9]Plaintiff explicitly ties each of her claims to her policy violation theory. *See* (Docket #49 at 7, 10, 11). Indeed, the only place where she even hints at a different argument is in her sur-reply, where Plaintiff states that

> [n]otwithstanding the arguments about the PCA Manual, Plaintiff has alleged sufficient details about the violative nature of Defendant's actions and conduct to be viewed as stand-alone violations of the FDCPA. She has argued how the contents of the calls and collection actions (apart from the PCA Manual) were harassing, oppressive, false and misleading. Dkt. 49.

Plaintiff's approach fails to raise viable claims. ICR contends that FDCPA claims do not arise *per se* from violations of other laws. *See Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 875 (7th Cir. 2015). Plaintiff counters that the Seventh Circuit has only enforced this rule as to Section 1692f claims. *Eul v. Transworld Sys.*, No. 15-C-7755, 2017 WL 1178537, at *4 (N.D. Ill. Mar. 20, 2017). While *Bentrud* and its predecessors only addressed Section 1692f claims, the general principle they announced seems to reach beyond that particular provision. *Bentrud*, 794 F.3d at 875 ("The FDCPA is not an enforcement mechanism for matters governed elsewhere by state and federal law. . . . But that is what Bentrud is attempting to do here; he seeks to transform the FDCPA into an enforcement mechanism for the arbitration provision in his credit card agreement."); *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 473-74 (7th Cir. 2007) (declining to agree with the plaintiff that "it is 'unfair' or 'unconscionable' for a debt collector to violate any other rule of positive law"); *Evory v. RJM Acquisitions Funding, L.L.C.*, 505 F.3d 769, 778 (7th Cir. 2007) ("Although a violation of state law is not in itself a violation of the federal Act, [citing *Beler*], a threat to impose a penalty that the threatener knows is improper because unlawful is a good candidate for a violation of sections 1692d and e.").

The Court need not finally resolve this issue, as the facts of this case are not analogous to the cited authorities. The deadlines to which Plaintiff

---

(Docket #53-1 at 2). The Court cannot locate these "stand-alone violation" arguments in her response brief. This conclusory statement in her sur-reply is insufficient to meaningfully raise such arguments. *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) (underdeveloped arguments are waived). Plaintiff tethered her theory of liability to the policy violations, and cannot untether it in her sur-reply in a final attempt to avoid summary judgment.

ties her claims are not law, and do not create rights running from ICR to Plaintiff. The Manual is a private document shared by the DOE with its PCAs which governs their collection activities.[10] Plaintiff does not suggest that she was ever told about its contents, or even its existence, prior to initiating this litigation. Similarly, Plaintiff could not have known about ICR's internal policies on what the default family size should be on a Financial Disclosure form. Plaintiff cannot use the FDCPA as a vehicle for enforcing the terms the Manual, which was part of an agreement to which she is not a party, or ICR's internal policies. In other words, ICR's failure to follow the rules established in those documents is not *per se* oppressive, misleading, or unfair conduct.

Instead of the Manual or ICR's training materials, the rules which actually govern ICR's conduct in this case come from the Code of Federal Regulations ("CFR"). Plaintiff makes no attempt to argue otherwise in her response or sur-reply. The only relevant CFR provision, 34 C.F.R. § 682.405(b)(1)(vi), provides that the RAL must be sent "[w]ithin 15 business days of [the PCA's] determination of the borrower's loan rehabilitation payment amount[.]" This accords with what Hunter told Plaintiff in the November 28 telephone conversation. (Docket #48 at 8) ("Once your proof of income is received *and reviewed*, a [RAL] will be sent to you within 15 days.") (emphasis added). On the undisputed facts, ICR sent its RAL the

---

[10]For purposes of this analysis, the Court assumes that the Manual Plaintiff presents is admissible. At their deposition, ICR's corporate representative could not testify that Plaintiff's version of the Manual was accurate or current, only that it appeared to be *a* version of the Manual. (Docket #50-3 at 136:21-138:14). Plaintiff's counsel represented that the document was the Manual provided by the DOE. *Id.* However, in her summary judgment submissions, Plaintiff has not laid a foundation which supports her counsel's representation at the deposition.

day after it reviewed Plaintiff's properly completed paperwork. Plaintiff points to no CFR provision creating a default family size or a time frame for ending a garnishment, so her theory on those points is a non-starter.

Even if the Court was inclined to read more generalized Section 1692d, e, and f arguments into Plaintiff's response brief, it would avail her nothing.[11] ICR attempted to help Plaintiff work through the steps towards entry into the rehabilitation program. By this lawsuit, Plaintiff attempts to foist her own errors—waiting months to submit the required documents, and failing to properly complete the Financial Disclosure form—onto ICR. The only meaningful delay attributable to ICR alone is the time between the receipt of Plaintiff's documents on April 25 and its discussion with Plaintiff's counsel about Financial Disclosure form beginning in June. Why was the problem with the form not mentioned sooner? ICR says it could not contact Plaintiff directly, but it was free to (and eventually did) talk to her counsel.

In the end, though, this observation does not swing the pendulum in Plaintiff's favor. Her brief is bereft of any analogy to a case which supports finding a violation of Sections d, e, or f in line with her policy violation, delay-based theory. In the absence of such authority, the Court concludes that no reasonable jury would accept the theory. While it certainly could have done more, nothing about ICR's conduct rises to the level of oppression, deception, or unfairness with respect to delaying the suspension of the garnishment.

---

[11]The Court need not do so. *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986) (the Court is not obligated "to research and construct the legal arguments open to parties, especially when they are represented by counsel").

This leaves only one claim which stands at least partially independent of Plaintiff's policy violation theory. She argues that during the January 10, 2017 telephone conversation, ICR did not adequately explain the application of the November 28, 2016 payment or ICR's ability to change how the payment was credited. Plaintiff maintains that absent these misstatements and omissions, she would have sent her rehabilitation paperwork to ICR in March, not April.

This might raise a valid Section 1692e claim if ICR's misstatements or omissions were material. The Seventh Circuit holds that "a false or misleading statement is only actionable under the FDCPA if it is material, . . . meaning that it has the ability to influence a consumer's decision." *Lox v. CDA, Ltd.*, 689 F.3d 818, 826 (7th Cir. 2012) (quotation omitted). The influence need not be enough to conclusively change the consumer's decision, but it must at least be "a factor in [their] decision-making process[.]" *Id.* at 827. In an affidavit submitted with her summary judgment response, Plaintiff claims that she would have sent her paperwork in sooner. (Docket #46 at 2-3). However, at her deposition, Plaintiff stated the following:

> Q: Do you recall why your paperwork wasn't turned in in December, January, February?
> A: In December I couldn't talk to anybody. Nobody was returning my calls. I never had received the paperwork. I made multiple calls in October and November to get the paperwork and I never received it.
> . . .
> Q: We discussed a little bit earlier that you didn't turn in the paperwork in December, January, February because you weren't able to get in contact with ICR, correct?
> Ms. Miller: Objection. Misstates testimony.

> A: I said that I could not – I didn't speak with anyone in December because they wouldn't take my call. That's what I said earlier. So I could not have sent the paperwork back because I wasn't able to speak with anyone.
>
> Q: What made you finally decide to return the paperwork to ICR?
>
> Ms. Miller: Objection. Attorney-client privilege. That was a conversation we had.
>
> A: That was a conversation we had.
>
> Q: So you are not going to answer the question based on attorney-client privilege?
>
> A: That's correct.

(Docket #39-5 at 33:16-22, 51:16-52:12).

Plaintiff cannot contradict her deposition testimony by affidavit. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571-72 (7th Cir. 2015). Plaintiff's deposition testimony confirms that the issues stemming from the January 10 conversation were not a factor in her decision on when to send the paperwork to ICR. Rather, the deposition establishes that the sole reason was that she did not have the paperwork. This reason provides no support for her current theory and, therefore, that theory must be rejected. In other words, she cannot load the trap at her deposition—refusing to share her explanation of her paperwork submission decision, under a claim of privilege—and then spring it now to survive summary judgment—by apparently waiving the privilege.

In sum, no reasonable jury could find any violations of Sections 1692d, e, or f on the theories Plaintiff presents, and so ICR is entitled to summary judgment on the entirety of Plaintiff's FDCPA cause of action.

### 4.2 WCA

Section 427.104 of the WCA addresses prohibited practices in the collection of a consumer debt. Wis. Stat. § 427.104. Plaintiff raises two claims

based on two of Section 427.104's subsections. The first is Section 427.104(h), which proscribes collection conduct "which can reasonably be expected to threaten or harass [a] customer." As this Court has recently noted, there is little caselaw interpreting this section. *Strohbehn v. Access Group, Inc. et al.*, No. 16-CV-985 (E.D. Wis.) (Docket #164 at 17-19). To the Court, this claim is not appreciably different than Plaintiff's Section 1692d claim for harassment and/or oppression. For the same reasons discussed above, ICR's conduct cannot be considered harassing under Plaintiff's theory of the case.

The second provision Plaintiff cites is Section 427.104(j), which says that collectors cannot "threaten to enforce a right with knowledge or reason to know that the right does not exist[.]" This claim relies on the same policy violation theory as the others. Plaintiff argues that "ICR knew the federally required standards that it was to follow. . . . ICR did not have a right to ignore the federally required standards, but it did." (Docket #49 at 13). ICR did not violate any of the legal standards applicable to its conduct in this case. Plaintiff is not entitled to relief under either section of the WCA.

5.   **CONCLUSION**

Plaintiff's theory of this case fails to offer viable claims for relief under the FDCPA or WCA. ICR's motion for summary judgment must, therefore, be granted, and this action dismissed with prejudice. The Court will also deny ICR's August 23, 2017 motion for a protective order, which ICR previously acknowledged had been rendered moot. (Motion, Docket #36; ICR's Reply, Docket #45 (conceding mootness)).

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for leave to file a sur-reply (Docket #53) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant's motion for a protective order (Docket #36) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment (Docket #40) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 21st day of November, 2017.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge